# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

UNITED STATES OF AMERICA

v.                                              CRIMINAL ACTION NO. 3:13-00331

JAMES ANTHONY MITCHELL

## MEMORANDUM OPINION AND ORDER

On December 17, 2013, Defendant James Anthony Mitchell was indicted for being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The firearm was discovered after the police conducted a pat-down search of Defendant. Defendant argues the search violated his Fourth Amendment rights. As a result, Defendant filed the pending Motion to Suppress. ECF No. 21. The Court held a hearing on the motion on October 16 and October 23, 2017, and heard testimony from three police officers. Thereafter, the Court directed the parties to submit additional briefing on the motion. Upon consideration of the parties' arguments and in light of the evidence presented, the Court **DENIES** the motion for the following reasons.

## I.
## FACTUAL BACKGROUND

In the very early morning of April 7, 2013, the Huntington Police Department received a phone call from Jim Smith. Mr. Smith reported there was a large fight involving about thirty people in the parking lot behind the Rehab bar, located at the corner of 12th Street and 4th Avenue in Huntington, West Virginia. The officers each recounted that this bar and similar bars in the vicinity were often the scene of fights and disturbances at closing time, resulting in the emergency dispatch of any and all available officers. This call was logged by dispatch on a "CAD

sheet"[1] at 3:11:29. The narrative section of the CAD sheet logged at 3:11:57 and 3:12:06 further provided, in part: "ADV[ISED] HEARD SOMEONE SAY THEY HAD A GUN[.]" *CAD* at 1, ECF No. 38-1. At 3:12:06, the narrative upgraded the fight to there being an assault victim. At 3:13:00, the narrative provides: "ADV[ISED] ONE SUSP KNOCKED OUT LAYING ON THE GROUND[.]" *Id.*

Huntington Police Officer Robert Black testified he was dispatched to the scene at 3:13.[2] Officer Black explained that, although it may not be the exact words, what is written in the narrative section of the CAD sheet is what is being relayed from dispatch over the radio to the officers. While Officer Black was in route, Corporal Benjamin Howard of the Huntington Police Department arrived at the bar and, over the radio, "advised that a bystander had told him that a male with red pants, black shirt, a black male had a firearm on him and was walking eastbound on 4th Avenue." *Tr.* at 10, ECF No. 39. Officer Black testified that, at the time he heard this information from Corporal Howard, he believed Corporal Howard was with the crowd at the bar because he had marked he was on the scene. Within one minute of hearing this report, Officer Black said he saw Defendant, who matched the description, walking eastbound in front of the Greyhound bus station. The Greyhound bus station is located on the corner of 13th Street and 4th Avenue, which is on the same block and eastbound of the Rehab bar. As soon as he saw Defendant, Officer Black said he immediately stopped his police cruiser, pulled his service weapon, and ordered Defendant to put his hands on head.

---

[1]CAD stands for computer-aided dispatch. A CAD sheet is a record of information received by dispatch and relayed to police officers over the police radio.

[2]The CAD sheet shows the time to be 3:13:54. *Id.* at 4.

Corporal Jacob Felix of the Huntington Police Department also testified he was dispatched to the scene. Corporal Felix stated that, at almost the same time he heard the description of the suspect, he saw Officer Black stop his cruiser and heard him announce over the radio that he sees the suspect. Corporal Felix said he accelerated to Officer Black's location and saw a person matching the suspect's description walking eastbound in front of the Greyhound station. Corporal Felix said there was no one near the suspect, and he did not see anyone else with red pants. When he stopped and got out of his vehicle, Corporal Felix said that Officer Black was giving Defendant verbal commands. Corporal Felix testified he drew his weapon to cover Officer Black so Officer Black could reholster his weapon and could approach Defendant to pat him down. When Officer Black conducted the pat-down, he found a firearm in Defendant's waistband. Defendant was arrested and taken into custody.

Corporal Benjamin Howard testified that he had no doubt that he was at the scene of the incident, but he admitted he had no specific recollection of the incident because the police routinely responded to similar disturbance calls at the bar and this incident happened nearly four and one-half years ago. Although he could not remember this specific incident, when asked about the information on the CAD sheet, Corporal Howard said he knew the original caller, Jim Smith. He said Mr. Smith was a regular at the bar and may have been an employee at one time. However, Corporal Howard could not recall with whom he spoke at the scene who gave him the information he put out over the radio. He explained that, "generally the situation is very dynamic, lots of people yelling and screaming, running up and getting in cars." *Tr.* at 50.

# II.
# DISCUSSION

The Fourth Amendment of the Constitution protects the rights of citizens "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. For an officer to make a brief, investigatory stop, there must be "a reasonable, articulable suspicion that criminal activity is afoot[.]" *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citation omitted). Whether reasonable suspicion exists depends upon the totality of the circumstances, *United States v. Sokolow*, 490 U.S. 1, 8 (1989), that existed "at the time of the seizure." *United States v. Gooding*, 695 F.2d 78, 82 (4th Cir. 1982) (citation omitted). Reasonable suspicion "is something more than an 'inchoate and unparticularized suspicion or 'hunch.'" *United States v. Burton*, 228 F.3d 524, 527 (4th Cir. 2000), quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968). However, the reasonable suspicion standard is less demanding than the probable cause and requires a showing appreciably less than a preponderance of the evidence. *Wardlow*, 528 U.S. at 123.

In determining whether reasonable suspicion exists, a court must apply an objective test of what information was known by the officer and any reasonable inferences that can be drawn by the officer at the time of the stop. *United States v. Crittendon*, 883 F.2d 326, 328 (4th Cir. 1989); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) ("When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." (citation omitted)). In other words, "judged against an objective standard: would the facts available to the officer at the moment of . . . the search 'warrant a man of reasonable caution in the belief' that the

action taken was appropriate?" *Terry*, 392 U.S. at 21-22 (citations and footnote omitted). In making inferences, officers may rely upon their own experiences and specialized training. *Arvizu*, 534 U.S. at 273.

When information an officer uses to determine if reasonable suspicion exists to make a *Terry* stop comes from a third-party, it must be evaluated in terms of whether it has "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *Alabama v. White*, 496 U.S. 325, 326-27 (1990). When information comes from a known source, officers may judge its credibility based upon their own experiences. However, an anonymous tip "seldom demonstrates the informant's basis of knowledge or veracity." *Id*. at 329.

In this case, although Officer Howard does not remember who at the scene told him about the gun and described the suspect, it was relayed through a face-to-face encounter within minutes of the first call being logged by dispatch. With purely anonymous tips, there is no way to judge the reliability, knowledge, or veracity of the informant without additional information or facts. *Florida v. J.L.*, 529 U.S. 266, 270-74 (2000) (finding an anonymous telephone tip that an individual had a gun was insufficient to support a stop and frisk where there were no additional corroboration to substantiate the tip). By contrast, the Fourth Circuit in *United States v. Christmas*, 222 F.3d 141 (4th Cir. 2000), explained that "face-to-face encounters with informants are altogether different from anonymous tips[.]" 222 F.3d at 143.

In *Christmas*, officers were investigating a homicide when a neighborhood resident approached them and said that there were guns and drugs on a porch two doors down from where

she lived. *Id*. at 143. The informant did not give the officers her name, but gave them her street address. The officers went to the address where the guns and drugs were reported to be, and they found four individuals standing on the porch. The officers told them they were there to investigate a report of drugs and guns. One of the officers recognized the defendant and conducted a pat-down search. Although the defendant denied having any weapons, the officer found a loaded firearm on him. Upon his arrest, a more thorough search yielded crack cocaine and marijuana. The defendant moved to suppress the evidence on the ground that the police lacked reasonable suspicion to search him. *Id*.

In considering the issue, the Fourth Circuit pointed to the underlying concern of whether informants are credible and accountable for their tips. *Id*. at 144. With respect to credibility, it is difficult for an officer who receives an anonymous telephone tip "to determine the source and reliability of the caller's knowledge." *Id*. (citation omitted). On the other hand, face-to-face encounters allow an officer to assess an informant's credibility and demeanor. Specifically, with respect to the facts in *Christmas*, the informant's house was close to the illegal activity and a reasonable officer could conclude the woman would know about the drug activity. In addition, the informant was close to the location of the alleged activity at the time she made the report, which exposed her to potential reprisal. *Id*. Moreover, an informant who speaks to an officer in person may be held responsible for making a false statement. *Id*. In *Christmas*, the informant went so far as to give her address, which "exposed her[] to the repercussions of misleading or deceiving the police." *Id*. The Fourth Circuit held that "[a]ll these factors make the information provided . . . more trustworthy and reliable than the anonymous tip at issue in *J.L.*" *Id*. Thus, the Fourth Circuit

rejected the defendant's argument the tip was insufficient to establish reasonable suspicion to conduct a *Terry* stop and search.

The Fourth Circuit reasoned that to accept the defendant's argument would be to interject "into the reasonable suspicion determination a rule similar to the inflexible "two-pronged test" for probable cause of *Aguilar v. Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S. Ct. 584, 21 L.Ed.2d 637 (1969)." *Id*. at 144-45. Additionally, there was evidence to corroborate the tip in *Christmas* because the officer knew that there were tensions between gangs where the defendant was from and where he was apprehended, which made it reasonable for the officer to assume there was a potential for violence. *Id*. at 145. As a matter of policy, the Fourth Circuit explained that "[t]o rule out [face-to-face] conversations as a basis for reasonable suspicion would be a serious step. A community might quickly succumb to a sense of helplessness if police were constitutionally prevented from responding to the face-to-face pleas of neighborhood residents for assistance." *Id*. Likewise, the Fourth Circuited stated officers must be able "to investigate such reports without jeopardizing their personal safety. Any other constitutional rule would destroy the basis for effective community police work." *Id*.

In this case, Defendant argues it is impossible to know if Officer Black was acting on reliable information when he stopped him because Corporal Howard cannot remember who gave him the tip and whether the unidentified person saw the gun or was merely passing along information from someone else. Without any evidence that the information was reliable, Defendant insists, the Government cannot meet its burden to show his seizure complied with the Fourth Amendment. *See United States v. McGee*, 736 F.3d 263, 269 (4th Cir. 2013) (stating "[t]he

government bears the burden of proof in justifying a warrantless search or seizure" (citation omitted)). However, in looking at the totality of the circumstances, the Court disagrees.

Here, a Mr. Smith made the initial call to the police to report a disturbance at the Rehab bar just after closing time. The officers testified they regularly were sent to the area around closing time because of problems that occurred when crowds of people left the bars. The initial remarks on the CAD report state that there was a large fight of about thirty people, someone said there was a gun, and a victim was knocked out on the ground. The evidence shows that Officer Howard was on the scene within minutes of the call. Although Corporal Howard cannot remember the specific incident, given the number of people involved and a reported victim, it certainly was an active crime scene, likely consistent with Corporal Howard's testimony that, "generally the situation is very dynamic, lots of people yelling and screaming, running up and getting in cars." *Tr.* at 52.

Shortly after his arrival, Corporal Howard broadcast over the radio that "a bystander had told him that a male with red pants, black shirt, a black male had a firearm on him and was walking eastbound on 4th Avenue." *Tr.* at 10. It is apparent that Officer Howard was reporting a face-to-face encounter with an individual who was at the scene. The bystander's report was consistent with, but in greater detail, than the initial report documented on the CAD sheet of someone having a gun. Both Officers Black and Felix heard Corporal Howard give this additional information over the radio as they were driving to the scene. Within one minute of hearing Corporal Howard's report, Officer Black stated he spotted Defendant, matching the description given by Corporal Howard, walking eastbound on the same block as the fight occurred. Officer

Black then effectuated a stop with the almost immediate assistance of Officer Felix. Officer Felix said he saw no one else wearing the distinctive red pants that Defendant wore and no one was near him.

Despite Corporal Howard's inability to recall whom the informant was, when the bystander made the statements to him, he or she faced the same incentives to tell the truth that any other informant would have in a face-to-face encounter with a police officer at the scene of a crime. Certainly, the bystander did not know that Corporal Howard would forget what happened. A bystander in that position reasonably would believe that Corporal Howard would assess his or her credibility and demeanor when they spoke, and the bystander could face repercussions if the information was false or malicious. The evidence also demonstrates that Defendant was fairly close to the scene when the bystander spoke to Corporal Howard. Thus, the fact the bystander decided to give Corporal Howard such information so quickly in a public setting with Defendant so close raises some level of risk to the bystander. Moreover, the bystander gave this information to Corporal Howard during an investigation of an active crime scene just moments after the fight occurred. Certainly, a face-to-face encounter so close in temporal and physical proximity to the fight gives it some additional source of credibility.[3] A reasonable officer would assume this

---

[3] These facts also distinguish this case from *United States v. Brown*, 448 F.3d 239 (3rd Cir. 2006), cited by Defendant. In *Brown*, the victim of a crime called a friend and gave a general description of two men who had just attempted to steal her purse. 448 F.3d at 241. A few minutes later, the friend called the victim and said he saw two men fitting the description, who were then stopped and searched by the police. *Id*. at 242. Although the victim's friend was not an anonymous caller, the Third Circuit said that a reasonable, trained officer would not assume the friend saw the attempted robbery, had any "particularized knowledge" or was "well-informed," and was providing information beyond what anyone could observe. *Id*. at 250 (internal quotation marks omitted). Thus, the friend's tip could not establish reasonable suspicion to justify a stop. *Id*. at 251. To the contrary, a reasonable, trained officer in this case could assume the bystander had "particularized knowledge" and was "well-informed" because he or she was at the scene and, very

information was coming from a person who had just witnessed the fight and saw a person with a gun at the fight, an imminent potential threat justifying immediate action to locate the suspect.

Although Defendant argues that the bystander could have just been repeating information that someone else gave him, the Court finds the evidence does not support Defendant's supposition or argument. There is a notation on the CAD sheet at 3:18:23 and 3:18:46 that provides "IN THE BACK PARKING LOT/ COMPL IS EMPLOYEE AT WORK RELEASE AND A BYSTANDER CAME UP TO HIM AND TOLD HIM/." *CAD*, at 1. Defendant suggested this was the information Corporal Howard obtained at the scene. However, when questioned about this information on the CAD sheet, Corporal Howard testified it appeared to him that someone from the work release center, which was near the scene, also called dispatch. *Tr.* at 47. The Court agrees with Corporal Howard. As stated by Officer Black, the information dispatch gives over the radio is what is written in the narrative. The details of this narrative are much different from the details Officers Black and Felix heard over the radio from Corporal Howard, which included a detailed description of Defendant and the direction he was walking. The testimony of Officer Black was that Corporal Howard said that a bystander spoke with him. There is no indication that the bystander who spoke with Corporal Howard was passing along second-hand information.[4]

---

quickly after Corporal Howard arrived, gave him a detailed description of Defendant, including his distinctive red pants and the direction he was headed.

[4]Even if the bystander was passing along second-hand information, it was an active crime scene with a victim and a detailed report of someone walking away from the scene with a gun. The close temporal and physical proximity to the event still gives it increased indicia of reliability.

In light of all these factors and the totality of the circumstances, the Court finds the tip in this case had more credibility than a purely anonymous phone tip and had a "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *White*, 496 U.S. at 326-27.[5] Accordingly, the Court finds Officer Black was justified in conducting a *Terry* stop of Defendant, and **DENIES** Defendant's Motion to Suppress.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel and the defendant, the United States Attorney's Office, the United States Probation Office, and the United States Marshals Service.

ENTER: December 1, 2017

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

---

[5]Defendant further asserts the officers could have engaged him in a consensual citizen-police encounter, which would not implicate the Fourth Amendment. Although the Court agrees the officers could have conducted a consensual citizen-police encounter, they were not limited to that approach. A reasonable officer could conclude that Defendant was armed and therefore dangerous under the under the circumstances of this case and it was necessary to pat-down Defendant for protection. *See United States v. Robinson*, 846 F.3d 694 (2017) (holding an officer was justified in frisking the defendant based on a reasonable suspicion he was armed and thus dangerous).